*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CV-0366

VANESSA SAMPAY, APPELLANT,

V.

AMERICAN UNIVERSITY, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2017-CA-008360-B)

(Hon. Kelly A. Higashi, Trial Judge)

(Argued December 9, 2021                    Decided May 18, 2023)

*Jeremy Greenberg*, with whom *Denise M. Clark* was on the brief, for appellant.

*John M. Remy* for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, MCLEESE, *Associate Judge*, and FISHER, *Senior Judge*.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Vanessa Sampay filed a four-count complaint alleging various violations of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, by her employer, appellee American University ("AU"). AU filed a motion for summary judgment on all

counts, and appellant filed a motion for partial summary judgment as to Count IV, which alleged impermissible retaliation. The trial court granted AU's motion and denied appellant's motion. Appellant appeals the trial court's grant of summary judgment for AU as to the retaliation claim only. We limit our review of the trial court's decision accordingly and affirm.

## I.      Factual Background & Procedural History

In 1999, appellant was hired by AU to work as a "HelpDesk Specialist" before being promoted in 2001 to a "LAN Analyst II" in its Office of Information Technology ("OIT"). In 2014, Hosein Nahidian, a former peer, became her direct supervisor. Appellant's performance reviews were generally positive for years 2014-2015 and 2015-2016, although appellant was characterized as "partially meet[ing]" some expectations.

However, in April 2016 following multiple performance concerns, Mr. Nahidian issued appellant a formal written warning. Appellant challenged the warning by filing a grievance memorandum with Mr. Nahidian and human

resources.[1] However, Mohammad Mirzabeigy, Mr. Nahidian's direct supervisor, ultimately upheld the warning in June 2016. According to his responsive memorandum, Mr. Mirzabeigy concluded that the conduct underlying the warning was consistent with performance concerns previously raised by Mr. Nahidian and reflected in her past performance reviews.[2] Mr. Mirzabeigy also concluded that her need to provide care for her sick child during the relevant time period did not provide an adequate excuse for not completing her project on time. Kamalika Sandell, Associate Chief Information Officer, thereafter issued appellant a "Communication of Expectations" memorandum outlining the expectations for how appellant was expected to improve her job performance.

Appellant responded to the Communications of Expectations memorandum by reporting to Ms. Sandell that there were "errors" in the position description for her role as a "LAN Analyst II." In response, in October 2016, appellant received a change of title and position description, transferring her within OIT to the role of "Systems Engineer." Per AU's policy for employees who transfer positions,

[1] AU represents that it uses the terms "human resources" and "employee relations" interchangeably. Appellant has not contested this characterization, and so we use these terms flexibly.

[2] The record does not contain information about what, if any, investigation preceded this determination.

appellant was placed on probation by AU's Employee Relations Office for a period of four months. Consequently, the probationary period was set to expire on March 1, 2017. Mr. Nahidian remained her direct supervisor.

On January 3, 2017, appellant received a subpoena by the District Court of Maryland for Prince George's County to testify on January 25, 2017 at a criminal trial that involved an intra-family dispute. She did not inform Mr. Nahidian or human resources of her need to take leave at that time. After normal business hours on January 24, 2017, appellant sent an e-mail to Mr. Nahidian and other colleagues notifying them that she would not be at work the following day. Her message read: "I will be out of the office tomorrow to attend[] to a personal matter, but will try to be online later in the afternoon." The next day, appellant did not show up to work. Mr. Nahidian replied directly to appellant that morning: "When was this leave approved? As we discussed back in November, any personal leave needs to be scheduled and approved ahead of time. This again raises my concern of your reliability to the team and ability to follow process."

On January 26, 2017, appellant returned to work. Appellant responded to Mr. Nahidian's e-mail stating: "I'm sorry, I meant to mention it to you earlier. I didn't remember until after returning home with [my daughter] from dance [the] evening

[of January 24]." Shortly after receiving her e-mail, Mr. Nahidian requested a private meeting with appellant in his office. After the meeting, appellant e-mailed Mr. Mirzabeigy, and Ms. Sandell, to express concern that, *inter alia*, Mr. Nahidian yelled at her during the meeting.[3] Appellant requested a meeting with the two of them to address her concerns. The following day, appellant also sent an e-mail to two individuals in the Employee Relations Office concerning the incident (the "January 27, 2017 e-mail"), adding that, when she mentioned she was not at work because she had to appear as a witness, Mr. Nahidian yelled at her to get out.

Appellant then met with Mr. Mirzabeigy and Ms. Sandell to discuss the incident involving Mr. Nahidian. During this meeting, Mr. Mirzabeigy suggested that appellant file a formal complaint with human resources. Appellant did so on February 7, 2017, and filed a complaint titled "EEO Complaint of Discriminatory

---

[3] In particular, appellant communicated the following in her e-mail:

> [Mr. Nahidian] came to my desk and asked if he could speak to me. I followed him to his office and he said that all leave needed to be approved and that I was unreliable and that he was tired of it. He said that my leave would be unexcused. When I explained to him that I had to be out yesterday to appear as a witness in court he said that he didn't care, that it would be unexcused. His yelling was unsettling to me and I don't feel well. Attached is documentation concerning my absence. I would really like to speak with you [both] further concerning this matter.

Harassment." Appellant did not allege the nature of the discrimination, she only stated that she experienced "discriminatory harassment" and was "verbally assaulted" by Mr. Nahidian.

On or around February 27, 2017, appellant was informed that Mr. Nahidian and Mr. Mirzabeigy extended her probation for an additional four months based on continuing concerns that they had about appellant's job performance. This decision to extend probation was one of three options available to supervisors at the end of a probation period, in addition to placing an employee in regular employment status or terminating the employee. Shortly thereafter, appellant complained to human resources that the extension of probation was in retaliation for her complaint of discrimination.

On March 6, 2017, human resources sent appellant a memorandum concluding that AU "could not find sufficient evidence of discrimination" motivating the January 26, 2017, incident, and that they "could not find sufficient evidence of any retaliatory motive behind the decision to extend [appellant's] probation" which "was completed in line with University policy and practice."

Human resources acknowledged that submitting a complaint is a legally protected activity, and retaliation against someone who files a complaint is prohibited.

On April 6, 2017, Mr. Mirzabeigy instituted a Performance Improvement Plan ("PIP") for appellant based on concerns with appellant's ability to: perform her systems administration duties; timely communicate status updates; respond to general inquiries; problem solve; properly escalate issues; and implement feedback. Mr. Mirzabeigy communicated that the PIP would allow him to "independently evaluate [appellant's] work and determine which, if any, performance issues exist." During the PIP, Mr. Mirzabeigy and appellant were to meet weekly about the goals outlined in the PIP and the progress made. Appellant was informed that "[f]ailure to achieve all of the goals and demonstrate the competencies consistently . . . will result in termination." After fifteen weeks, nine more weeks than contemplated by the PIP, Mr. Nahidian and Mr. Mirzabeigy determined that appellant did not show sufficient improvement toward the performance goals and competencies set out in the PIP. On July 21, 2017, appellant received a termination memorandum based on her "failure to meet the requirements of a [PIP]."

On December 14, 2017, appellant filed a four-count employment discrimination complaint in Superior Court, alleging (I) a hostile work environment because of family responsibilities; (II) a retaliatory hostile work environment; (III) disparate treatment because of family responsibilities; and (IV) disparate treatment due to retaliation for filing her EEO Complaint. AU moved for summary judgment on all counts, and appellant moved for partial summary judgment solely on Count IV. The trial court granted AU's motion and denied appellant's motion. As to Count IV, the trial court's ultimate conclusion rested on the determination that appellant failed to create a genuine dispute of material fact on the question of whether AU's legitimate business reasons for its various employment-related actions were merely a pretext for a retaliatory act. Appellant's appeal of the adverse judgment on her retaliation claim timely followed.

## II.    Analysis

We review the grant of a motion for summary judgment de novo, applying the same standard used by the trial court. *Propp v. Counterpart Int'l*, 39 A.3d 856, 871 (D.C. 2012). We affirm if we conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

*Id.* (internal quotations omitted). "Although we view the evidence in the light most favorable to the party opposing the motion, conclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment." *Furline v. Morrison*, 953 A.2d 344, 352 (D.C. 2008) (internal quotations omitted).

The DCHRA makes it "an unlawful discriminatory practice for an employer to take adverse action against an employee . . . for a [prohibited] discriminatory reason . . . ." *Furline*, 953 A.2d at 352 (internal quotations omitted).[4] Further, the DCHRA "makes it unlawful for an employer to retaliate against an employee for opposing an employment practice that is prohibited by the Act[,]" such as discrimination. *Vogel v. D.C. Off. of Plan.*, 944 A.2d 456, 463 (D.C. 2008).

---

[4] Appellant did not plead in her complaint that she was retaliated against only in part for a discriminatory reason, nor did appellant argue in her motion for partial summary judgment that she was retaliated against only in part for a discriminatory reason. Further, although appellant cited to the pertinent legal standards establishing that this jurisdiction recognizes a "mixed motive" theory of retaliation under the DCHRA, appellant did not raise any arguments in her appellate briefs or during oral argument suggesting she is raising a mixed motive claim. Accordingly, we conclude that appellant has not raised such a claim, and, therefore, we do not address whether AU acted with a mixed motive. *See Furline*, 953 A.2d at 353.

In cases where the plaintiff "rel[ies] on circumstantial evidence, rather than direct evidence linking the personnel action to a forbidden motive, we evaluate [the plaintiff's claim] utilizing the tripartite burden-shifting framework set forth in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)]." *Furline*, 953 A.3d at 352. Under the *McDonnell Douglas* burden-shifting framework,

> a plaintiff bears the initial burden of producing evidence to sustain a prima facie case. If the plaintiff satisfies this burden, the employer must then produce evidence of a legitimate, nondiscriminatory or nonretaliatory reason for its action. If the employer offers a legitimate, nondiscriminatory or nonretaliatory reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. The ultimate burden of persuasion rests with the plaintiff to show that the defendant acted with impermissible motive or intent.

*Propp*, 39 A.3d at 863 (quoting *Chang v. Inst. for Pub.-Priv. P'ships, Inc.*, 846 A.2d 318, 329 (D.C. 2004)) (cleaned up); *see also McDonnell Douglas*, 411 U.S. at 802-04. We address each step of the *McDonnell Douglas* framework, applying this standard, in turn.

## A. Prima Facie Case of Retaliation

"To establish a prima facie case of retaliation, the plaintiff must demonstrate by a preponderance of the evidence that: (1) [she] was engaged in a protected activity . . . ; (2) the employer took an adverse action against [her]; and (3) a causal

connection existed between [her] opposition or protected activity and the adverse action taken against [her]." *Propp*, 39 A.3d at 863.

### 1. Protected Activity

As an initial matter, the parties disagree as to what conduct of appellant constitutes protected activity for purposes of this appeal. *See Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 36 (D.D.C. 2007) ("[N]ot every complaint by an employee is encompassed by the DCHRA."). The trial court's order stated that Count IV of the Complaint alleged that the retaliation was based on appellant's submission of her February 7, 2017 EEO Complaint to human resources, a protected activity.[5] However, on appeal, appellant contends that both her January 27, 2017 e-mail to human resources and her February 7, 2017 EEO Complaint constituted protected activities. In response to AU's argument that appellant should be limited

---

[5] The trial court does not appear to have made a finding concerning whether the filing of the February 7, 2017 EEO Complaint constituted a protected activity, which AU disputed below and continues to dispute on appeal. It is unclear whether that was an inadvertent omission or the trial court determined it need not reach that question, having found appellant failed to prove pretext. Regardless, the parties have fully briefed this question on appeal and we deem it properly before us.

to the allegations set forth in her complaint, appellant contends that the trial court was aware of the January 27 e-mail.

The question is not whether appellant had introduced the January 27, 2017 e-mail into the record, but whether appellant had sufficiently pleaded that the January 27, 2017 e-mail constituted protected activity in her complaint. *See generally Scott v. District of Columbia*, 493 A.2d 319, 323 (D.C. 1985) ("It is not error . . . for a trial judge to limit his consideration to issues unequivocally raised by the complaint."). Even construing the complaint liberally, appellant references only the February 7, 2017 EEO Complaint after the header contending that "After Engaging in Protected Activity, Ms. Sampay Is Placed on Probation." Appellant's only reference to the January 27, 2017 e-mail in the complaint is a vague statement that the "evening and the next day [after the meeting with Mr. Nahidian], [appellant] reported the incident to [AU's] Employee Relations office." Likewise, appellant's motion for partial summary judgment only argued that she "engaged in protected activity when she submitted her EEO complaint to [AU]." Again, appellant failed to allege that the January 27, 2017 e-mail constituted protected activity. In consideration of the entire record, we conclude that appellant failed to sufficiently allege that the January 27,

2017 e-mail constituted a protected activity. Accordingly, we deem it not properly before us for review.[6]

Turning now to whether the February 7, 2017 EEO Complaint constituted protected activity within the meaning of the DCHRA, we conclude that it did. We have previously stated that the "employee must alert the employer that she is lodging a complaint about allegedly [unlawful] discriminatory conduct." *Vogel*, 944 A.2d at 464 (internal quotation marks omitted). Even if the actions complained of were lawful, an "employee is protected from retaliation . . . so long as the employee reasonably believed the employer's action was discriminatory." *Propp*, 39 A.3d at 863. Although "no 'magic words' are required," *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006),[7] employees are required to put their employer on notice

---

[6] We note that even were we to consider appellant's January 27, 2017 e-mail informing her supervisors that Mr. Nahidian yelled at her due to her family responsibilities to be before us and we were to conclude that it constituted protected activity, we would still reach the same conclusion that the trial court properly granted summary judgment to AU. All of the adverse employment actions alleged occurred *after* the February 7, 2017 EEO Complaint. Accordingly, through the February 7, 2017 EEO Complaint, appellant has established as part of her prima facie case that she engaged in protected activity prior to any of the adverse employment actions regardless of whether the January 27, 2017 e-mail separately constituted a protected activity.

[7] "This court has often looked to cases construing Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e *et seq*. to aid us in construing the D.C. Human Rights

of the grounds on which discrimination is alleged, s*ee Howard Univ. v. Green*, 652 A.2d 41, 46 (D.C. 1994) (explaining that a complaint alleging favoritism but not explaining that it was the result of sexual orientation discrimination was insufficient notice of the nature of the claim of discrimination).  Where a complaint fails to make the nature of the discrimination explicit, "an employer's awareness [of the nature of the complaint] may be inferred in a given set of factual circumstances, the employee must sufficiently alert the employer to the nature of her complaint."  *Id.* at 48; *Howard Univ.*, 652 A.2d at 47 ("[T]he communication of a complaint of unlawful discrimination, in a given set of factual circumstances, may be inferred or implied[.]" (citation and emphasis omitted)).

Appellant's February 7, 2017 EEO Complaint did not explicitly set forth the context of the discrimination that was alleged.  However, the record reflects that AU was aware of the circumstances from which the initial incident arose, including that it was family-related.  Additionally, we find it relevant that AU contemporaneously acknowledged in its "Determination of Complaint" that appellant's complaint alleged that her supervisor "engaged [in] discrimination."  We conclude that taken

---

Act." *Propp*, 39 A.3d at 864 n.11 (quoting *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 n.17 (D.C. 1993)) (cleaned up).

together, this is sufficient for appellant to have satisfied her burden of proof at this stage. *See Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1225 (2d Cir. 1994) ("[P]laintiff's burden of proof [of establishing a *prima facie* case] . . . under the *McDonnell Douglas*[] analysis is *de minimis* at this stage . . . .").

## 2. *Adverse Employment Action*

An adverse employment action is one in which "a reasonable employee would have found the challenged action materially adverse which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Propp*, 39 A.3d at 863-64 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). The burden of demonstrating that a reasonable worker might well have been dissuaded from making or supporting a charge of discrimination does not require a showing that the retaliatory conduct directly affected the terms and conditions of employment. *See Bereston v. UHS of Del., Inc.*, 180 A.3d 95, 112 n.51 (D.C. 2018) (quoting *Burlington N.*, 548 U.S. at 68); *see also Powell v. Lockhart*, 629 F. Supp. 2d 23, 42 (D.D.C. 2009) (explaining that the materiality standard for a retaliation claim is more liberal). However, "the standard of material adversity is meant to separate significant from trivial harms . . . ." *Bereston*, 180 A.3d at 112 (internal citations and quotations omitted). "[N]ot

everything that makes an employee unhappy is an actionable adverse action." *Id.* (citation omitted).

On appeal, appellant argues that three discrete actions by AU constituted adverse employment actions: (1) AU extended her probation an additional four months; (2) AU issued her a PIP; and (3) AU terminated her. We address each in turn.

AU's extension of probation constitutes an adverse action for purposes of maintaining a retaliation claim because it could have dissuaded appellant from pursuing her claim of discrimination. *See, e.g.*, *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996) (suggesting that probation could constitute an adverse employment action for a retaliation claim). Although AU in its brief argues that appellant cannot demonstrate that she was harmed in any way, demonstrating harm is the requirement for a discrimination claim, *not* a retaliation claim. *See Bereston*, 180 A.3d at 112 n.50. Even if AU had a lawful business reason for extending appellant's probationary period (which may contribute to a finding that the action was not pretextual), a lawful business reason does not prevent the extension of probation from constituting an adverse action. *See Propp*, 39 A.3d at 866. For the

same reason, AU errs in its argument that placement of appellant on a PIP was not an adverse action. *See also Powell*, 629 F. Supp. 2d at 42-43 (concluding that a PIP was capable of constituting an adverse employment action for a retaliation claim). Finally, we can summarily conclude, and AU does not contest, that AU's decision to terminate appellant constituted an adverse employment action. *Nicola v. Washington Times Corp.*, 947 A.2d 1164, 1172 (D.C. 2008) ("Job termination [is] inherently an 'adverse employment action.'").

### 3. Causal Connection

Next, we must consider whether appellant has established as part of her prima facie case that there was a causal connection between the protected activity and the adverse action taken against her. *See Propp*, 39 A.3d at 868. We consider whether appellant has presented sufficient evidence that there was a causal connection between her filing of the February 7, 2017 EEO Complaint and the adverse employment actions. The three alleged events took place between about three weeks and five-and-a-half months following the protected activity.

"Temporal proximity between the protected activity and the adverse action can establish the causal connection." *Propp*, 39 A.3d at 868. In other words, the

causal connection "may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Hollins v. Fed. Nat. Mortg. Ass'n*, 760 A.2d 563, 579 (D.C. 2000) (citation omitted). In the past, we have considered time periods of two days and nine days between the protected activity and the adverse employment action sufficient. *See, e.g.*, *Carter-Obayuwana v. Howard Univ.*, 764 A.2d 779, 793 (D.C. 2001) (concluding two days was sufficient); *Nicola*, 947 A.2d at 1175 (determining nine days was sufficient and further noting the D.C. Circuit's approval of a period of a few weeks in *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1368 (D.C. Cir. 2000)).[8]

What is less clear is whether, as appellant contends, a plaintiff can establish a causal connection where there was a four (or five) month lapse between the initial protected activity and the adverse employment action. Appellant contends that this court in *Propp* concluded the plaintiff presented sufficient evidence of a causal

---

[8] The causal connection need not be proved through a temporal proximity between events. *See, e.g.*, *Propp*, 39 A.3d at 868 (considering direct evidence of a causal connection). However, appellant has not alleged that there is direct evidence of a causal connection, nor can any be discerned from an independent review of the record.

connection as part of his *prima facie* case where there was a four-month period between the protected activity and the adverse employment activity. It is unclear whether that is an accurate characterization. In *Propp*, the protected action was a letter that Propp's counsel sent to his employer contesting his termination and the adverse action was the employer's refusal, five months later, to negotiate a future consulting agreement without adding punitive terms to the contract. 39 A.3d at 860-61, 866. However, when discussing Propp's prima facie case, we noted that in addition to the "close" temporal link, there was direct testimonial evidence and party admissions showing that the adverse employment action was undertaken in direct response to the protected activity. *Id.* at 868. As such, we did not opine about whether the temporal connection considered alone would have been sufficient to satisfy Propp's burden. Here, whatever implications that the lapse in time may have on appellant's ability to satisfy her ultimate burden, we think it is nevertheless sufficient to establish her prima facie case. *But cf. Johnson v. District of Columbia*, 935 A.2d 1113, 1120 (D.C. 2007) (concluding in the context of the District of Columbia Whistleblower Protection Act, D.C. Code § 1-615.51 *et seq.*, that a plaintiff failed to create a genuine dispute of material fact on the question of whether there was a causal connection based on a four-month lapse of time between a protected disclosure and an adverse employment action).

**B. Legitimate, Non-Retaliatory Reason**

"Once [plaintiff] has presented a prima facie case of retaliation, the burden shifts to [the employer] to show a legitimate, non-retaliatory reason for the contested action." *Propp*, 39 A.3d at 868. At this stage, the employer need only make a proffer; the persuasiveness of the evidence is not considered until the court needs to determine whether that reason was pretextual. *See generally Johnson v. District of Columbia*, 225 A.3d 1269, 1281-82 (D.C. 2020).

AU proffered legitimate, non-retaliatory reasons for its actions. As for its decision to extend appellant's probation, AU proffers that the decision to do so was done in lieu of termination under AU's policies to allow appellant further time to improve in her role. Similarly, AU proffers that its decision to impose the PIP was also in lieu of termination. Finally, AU proffers that appellant's termination followed a determination that appellant failed to "adequately achieve the goals and competencies set forth within the PIP, even after [AU] gave [appellant] a four-week extension of the PIP." Accordingly, we conclude that AU has satisfied its initial burden of production and the burden has shifted back to appellant to demonstrate pretext.

## C.     Pretext

Once an employer has proffered a legitimate, non-retaliatory business reason for its action, the burden shifts back to the plaintiff to establish by a preponderance of the evidence that the employer's proffered reasoning for its action was not its true reason, but a pretext for retaliation.  *Johnson*, 225 A.3d at 1281; *Atl. Richfield Co. v. D.C. Comm'n on Human Rights*, 515 A.2d 1095, 1100 (D.C. 1986) ("[The employee's burden of production to show pretext] merges with the ultimate burden of persuasion on the question of intentional discrimination.").  To survive a motion for summary judgment, a plaintiff must set forth sufficient evidence that, after considering both the plaintiff's evidence and drawing all reasonable inferences in their favor, the employee has created a genuine dispute of material fact on the question of whether the employer's proffered reasoning was pretextual.  *Hollins*, 760 A.2d at 562 n.6.  This requires that the employee "either directly [establish pretext] by [proving] that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of

credence." *Id.* at 573 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

While temporal proximity may be used to establish pretext, "positive evidence beyond mere [temporal] proximity is required to defeat the presumption that the proffered explanations are genuine." *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007). An employer's failure to follow its own policies can provide this type of affirmative evidence of pretext. *See, e.g.*, *Jeffries v. Barr*, 965 F.3d 843, 858 (D.C. Cir. 2020); *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 224 (D.C. Cir. 2016); *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 221 (D.D.C. 2010). However, "an employer's failure to follow its own regulations and procedures, alone, may not be sufficient to support the conclusion that its explanation for the challenged employment action is pretextual - but such a failure is certainly not irrelevant." *Jeffries*, 965 F.3d at 858 (cleaned up). Moreover, "courts are not free to second-guess an employer's business judgment, and a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding an employer's articulated reasons for its decisions," *Propp*, 39 A.3d at 870 (quoting *Furline*, 953 A.2d at 354)

(cleaned up). But "employers cannot shield their adverse actions as business judgment if the record belies the proffered reason." *Id.*

Appellant contends that AU's failure to abide by its written policies by extending her probation without her supervisor completing an extension of probation form by the end of the probation period was evidence of pretext. Although AU characterizes this as "literally an argument of form over substance," appellant characterizes this as a requisite action under AU's probation policies that was consequential because appellant would have been automatically converted to regular employee status absent completion of the form. While it is true that under AU's policy appellant's supervisor was required to complete the form, appellant does not provide anything other than conjecture to explain why the failure to fill out the form is evidence of pretext.

It is uncontested that at the end of a probation period the employee's supervisor may extend probation up to four months, place an employee in regular employment status, or terminate the employee. Although appellant contends that she was entitled to the benefit of an automatic return to regular status because her supervisors did not complete the form, it is uncontested that the same form states

that a supervisor seeking to extend probation is asked to "please contact the Employee Relations Team" in the space prior to indicating how the initial period of probation was resolved. Consequentially, appellant's contention that her supervisors' decision to verbally contact human resources, rather than complete a form to send to human resources, was evidence of pretext, when the ultimate outcome of extending her probation would have been the same, is insufficient to create a genuine dispute of material fact on the question of pretext.

Likewise, appellant's other arguments concerning AU's failure to follow its policy requiring completion of the form to extend probation also fail to create a genuine dispute of material fact on the question of pretext. For example, appellant has not introduced any evidence in the record demonstrating that the failure to complete this form was a unique practice as to her, rather than a common practice at AU. *Cf. Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("In fact, the procedure that the [employer] followed is reasonable and was, according to undisputed testimony, its usual procedure. That is, departure from the prescribed procedure had become the norm."). Nor has appellant introduced any evidence in the record demonstrating that failure to follow the process otherwise deprived her of the protections afforded to her by this policy. *Cf. Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) (concluding a jury could find an employer's decision to make

an internal applicant compete against external applicants for a directorship pretextual when the employer had not instituted that practice for other directorships being filled around the same time).

Appellant further argues that AU's failure to abide by its PIP policies is evidence of pretext. Appellant contends that AU did not adhere to its stated procedures because Mr. Mirzabeigy did not "independently evaluate" her, but relied, at least in part, on Mr. Nahidian's opinion on her performance. On the other hand, AU argues that appellant errs in asserting that the PIP prohibited Mr. Nahidian's involvement or that Mr. Mirzabeigy's evaluation was not otherwise independent. The record does not support appellant's arguments. First and foremost, no evidence in the record indicates that AU had a specific policy of requiring a PIP evaluation without any involvement of an employee's direct supervisor. Second, while it is true that the letter communicating the PIP expressed that Mr. Mirzabeigy would "independently evaluate" appellant's work performance, AU correctly notes that neither the letter nor the PIP itself disclaims any involvement by Mr. Nahidian. Indeed, it is hard to reconcile how Mr. Mirzabeigy could "actually determine" whether there were performance issues without communicating with Mr. Nahidian about her work, especially when the action plan for at least one goal outlined that

there would be "[b]iweekly team meetings with your manager [Mr. Nahidian] and the senior director [Mr. Mirzabeigy]."

Next, appellant argues that AU's reason for terminating her—that she failed to satisfy the PIP—was pretextual. Relevant to the termination, appellant argues that pretext can be established because AU's proffered legitimate, nondiscriminatory reasons were induced or otherwise tainted by Mr. Nahidian's influence because he had a retaliatory motive based on his knowledge of the February 7, 2017 EEO Complaint. AU argues that appellant errs in asserting that Mr. Nahidian knew of the February 7, 2017 EEO Complaint or that there was otherwise evidence that Mr. Nahidian expressed a retaliatory motive, but that even if he did, Mr. Mirzabeigy's evaluation was still independent.

Although it is relevant whether Mr. Nahidian knew of the February 7, 2017 EEO Complaint, appellant must create a genuine dispute of material fact on the question of whether the actual decision-maker—in this case Mr. Mirzabeigy—possessed the discriminatory motive or was tainted or influenced by someone who possessed a discriminatory motive. *Furline*, 953 A.2d at 354. Even assuming Mr. Nahidian knew of the February 7, 2017 EEO Complaint and, therefore, possessed a

retaliatory motive, because the complaint was not lodged against Mr. Mirzabeigy, appellant has not introduced evidence creating a genuine dispute of material fact concerning whether Mr. Mirzabeigy himself possessed a retaliatory motive.

Appellant also has not created a genuine dispute of material fact concerning the question whether Mr. Mirzabeigy was tainted or influenced by Mr. Nahidian's allegedly retaliatory motive, rather than making the decision to terminate her based on his independent judgment after continued documented performance issues despite being on a PIP for an extended period of time.[9] The record, without evidence to the contrary, reflects that at times Mr. Mirzabeigy's evaluation of appellant's performance diverged from Mr. Nahidian's evaluation in appellant's favor. For example, Mr. Mirzabeigy stated at one point during the PIP process that appellant was doing "much better" based on his personal observations of her in meetings, even though Mr. Nahidian thought to the contrary. Beyond that, appellant does not identify a single instance in which Mr. Mirzabeigy merely adopted, uncritically, Mr. Nahidian's opinions about appellant's performance. Further, Mr. Mirzabeigy testified to his belief he was independently evaluating appellant and appellant has

---

[9] We are unpersuaded by appellant's arguments that there is a material dispute of fact over whether appellant failed to meet the performance standards outlined in her termination letter.

not produced evidence beyond speculation to the contrary. Even viewing this issue in the light most favorably to appellant, appellant cannot survive summary judgment on the issue of whether she "directly [established pretext] by [proving] that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Hollins*, 760 A.2d at 573 (internal quotations omitted).

### III.    Conclusion

Based on the foregoing, we conclude that appellant's filing of her February 7 EEO Complaint constituted a protected activity within the meaning of the DCHRA. However, appellant has failed to create a genuine dispute of material fact on the question of whether AU's stated legitimate, non-retaliatory reasons for taking adverse actions against her were, in fact, pretextual. Therefore, the grant of summary judgment in favor of AU by the trial court as to Count IV is, hereby, affirmed.

*So ordered.*